**In the Matter of U.S. TRUCK COMPANY, INC., a Michigan corporation, Debtor.**

No. 84–CV–3920.
Bankruptcy No. 82–03561.

United States District Court,
E.D. Michigan, S.D.

Feb. 4, 1985.
As Amended Feb. 14, 1985.

Joseph S. Radom, Southfield, Mich., for debtor.

Barbara Rom, David D. Murphy, Detroit, Mich., for Unsecured Creditors' Committee.

Gerry M. Miller, Milwaukee, Wis., for Teamsters' Union.

## MEMORANDUM OPINION AND ORDER CONFIRMING FIFTH PLAN OF REORGANIZATION

PHILIP PRATT, District Judge.

On December 11, 1984, this Court withdrew the reference to the Bankruptcy Court of the Chapter 11 proceedings in this matter.[1] On December 14, 1984, the Court approved the Fourth Amended Disclosure Statement and scheduled the hearing on the confirmation of the Fifth Amended Plan of Reorganization for January 23, 1985. The Court also fixed the deadline of January 18, 1984, for filing acceptances or rejections to the Plan. Late in the afternoon of January 18th, the Bankruptcy Court Clerk received a telegram from the Teamsters National Freight Industry Committee (hereinafter the "National Committee") which purported to state the Union's objections to the confirmation of the plan. On January 22, 1985, the debtor-in-possession as proponent of the plan requested Court-ordered confirmation, commonly re-

---

1. On August 10, 1984, the Court withdrew the reference to the Bankruptcy Court because several pleadings required for their resolution consideration of both Title II of the United States Code, the Bankruptcy Reform Act, and other laws regulating organizations or activities affecting interstate commerce. The Court determined that withdrawal of the reference is mandatory in such cases under 28 U.S.C. § 157(d). The Court, however, remanded the proceeding back to the Bankruptcy Judge Stanley B. Bernstein who was to make findings of fact and conclusions of law on any noncore issues for this Court's *de novo* review.

After the Bankruptcy Court passed upon the issues before it several appeals were taken to this Court. Bankruptcy Judge Bernstein also resigned his position shortly thereafter. A replacement for Judge Bernstein has not been appointed which left this proceeding without a Bankruptcy Judge who could devote his full efforts to resolving this proceeding. Since this situation threatened the substantial progress which had been made to date to resolve this matter, this Court withdrew the reference to the Bankruptcy Court in its entirety to preside over the case.

ferred to as "cramdown", pursuant to 11 U.S.C. § 1129(b). The Court conducted hearings and received testimony concerning the propriety of confirmation. For the reasons stated herein the Court confirms the Fifth Amended Plan of Reorganization.

## I.

This case has a long and turbulent history which need not be repeated here. For the purposes of the matter now before the Court the following facts are relevant.

On June 11, 1982, U.S. Truck Company, Inc. filed a petition for relief under Chapter 11 of the Bankruptcy Code. The debtor operates a trucking company primarily engaged in the intrastate shipping of parts and supplies for the automotive industry. On July 15, 1982, the debtor sought to reject its collective bargaining agreement with the Union. The debtor alleged that it could no longer survive if it were required to comply with the terms of the National or Master Bargaining Agreement. In granting this petition the Bankruptcy Court concluded:

> Testimony presented at the ... hearings established that the debtor is incurring staggering losses; that measures undertaken to reduce expenses have proved insufficient to reverse the loss trend; that the debtor cannot survive given the wage requirements of the collective bargaining contract currently in effect. The Court therefore finds that rejection of the labor contract is absolutely necessary to save the debtor from collapse.

Memorandum Opinion and Order, December 6, 1982, at page 8 (Woods, J.).[2] Subsequently the debtor and the Union entered into negotiations and in January of 1983, the terms for each party reached an agreement on a new labor contract. The new agreement contained several revisions including a change to owner/operator operations.[3] That contract is scheduled to expire in March of 1985, when the National or Master Agreement is to be renegotiated. Each participating local union agreed to recommend approval of the new contract. On January 11, 1983, the local union membership approved the new labor agreement by a vote of 90 to 39. On April 14, 1983, the Joint Area Rider Committee of the Teamsters reached a deadlock on the validity of the new contract.[4] Nonetheless, in January of 1983, the local union and the debtor implemented the terms of the new labor contract.

The new labor contract and favorable lease agreements between the debtor and Central Transport, Incorporated, have enabled the debtor to reverse the trend of overwhelming losses and show a profit. Since June of 1984, the debtor's operating income has ranged from $125,000 to $228,000.

In August of 1984, the National Committee filed an Amended Proof of Claim for damages which allegedly resulted from the rejection of the collective bargaining agreement in the amount of $5,002,321.

Since the parties were operating without a fully approved labor contract, the Union and the debtor commenced serious negotiations to reach a new agreement in the fall of 1984. On November 20, 1984, an agreement was signed by the respective committees representing the parties. In this agreement the debtor made certain concessions which made it more favorable to the Union than the agreement of January 1983. This agreement, however, did not change the owner/operator system. Also under the terms of the agreement all claims of the Union as representative of its members

---

2. This case was originally assigned to Bankruptcy Judge George E. Woods. When Judge Woods was appointed to the District Court bench, Bankruptcy Judge Bernstein presided over this matter.

3. The owner/operator provision freed the debtor from owning and maintaining a large fleet of trucks. Employees became responsible for those aspects of the operation.

4. A second meeting of the same Committee for the purpose of considering this issue was to have occurred on September 28, 1983. The result of that meeting, if any, has not been made known.

were to be withdrawn, including the National Committee's Amended Claim for Damages.[5] The leadership of the Local Unions approved the agreement on November 28, 1984. In early 1985, however, the Union's Central Conference, part of the National Committee, voted to reject the new agreement. The National Committee asserted six points of contention or deficiency in the new agreement which prompted the rejection. If accepted by the debtor, these six points would have made the new agreement nearly identical to the National Agreement, which the Bankruptcy Court had previously ruled the debtor could properly reject. The Court ordered the parties to resume negotiations and apparently many of these points on the bargaining level have been resolved, except for the issue of owner/operator.

The National Committee's rejection of the new agreement left the withdrawal claim unresolved. In order to avoid delay in the confirmation of the plan due to the uncertainty of this claim,[6] the debtor filed its objections to the claim and moved to estimate the claim pursuant to 11 U.S.C. § 502(c). The hearing on this matter was scheduled for January 16th, two days before objections to the Fifth Amended Plan were required to be filed. Moments before the hearing on this matter the debtor and the National Committee reached an agreement which resolved these motions. The agreement is embodied in a consent order entitled "Order Estimating Claim of Teamsters National Freight Committee." The Order provides that for the purposes of the confirmation of the plan the National Committee's claim would be estimated at $2,000,000.[7] The parties asserted on the record that they were not waiving any rights with respect to their respective positions. The National Committee would still be able to assert a claim for $5,000,000 at a later date and the debtor would be able to pursue its objections. The Order emphasizes that the reason for the agreement and the estimation of the claim was to avoid any undue delay in the confirmation procedure.

On the final hour that objections to the plan would be filed, the Bankruptcy Clerk received a telegram from the National Committee which cursorily asserted two grounds for its objection to confirmation. The debtor did not receive this telegram until Monday, January 21st. This telegram inadequately expressed the position of the National Committee and the Committee's arguments were not properly presented until the Committee delivered a supplemental brief three hours before the hearing for confirmation was scheduled.[8] In response to its objection, the debtor requested the Court to hear a motion to confirm the plan or for "cramdown" over the National Committee's objection pursuant to 11 U.S.C. § 1129(b).

---

5. The Union was not required to dismiss its existing lawsuit concerning Michigan License Fees.

6. *See* 11 U.S.C. § 502(c) and § 1129.

7. The Order states in part:
   (a) Written objections have been interposed by the Debtor to the Claim of the Negotiating Committee in which the Debtor avers that the employees represented by the Committee have not sustained any compensatory damages resulting from the rejection of the Collective Bargaining Agreement;
   (b) Extensive discovery will be required before trial;
   (c) A hearing has been scheduled for January 23, 1985 with respect to confirmation of the Debtor's Plan of Reorganization; and

   (d) This case may be unduly delayed unless the claim of the Committee is estimated for allowance.

8. The National Negotiating Committee's telegram was a wholly inadequate document to apprise the plan's proponent and the Court of the Committee's objection. This deficiency coupled with the Committee's last minute filing of an adequate pleading informing the Court and the debtor of the grounds for the Committee's objection defeated the purpose of a deadline for rejection. This conduct certainly permits the inference that the objection was interposed for purposes of delay and tactical advantage especially when it is coupled with the failure of the Committee to offer any evidence at the hearing.

## II.

The National Committee was the only party to object[9] to confirmation of the Fifth Plan of Reorganization.[10] The Committee objects on two grounds. First, the Committee argues that the plan improperly places its claim in a different class than the claims of other impaired unsecured creditors. The National Committee's claim is treated in Class IX which is described as the unsecured impaired claims for damages allegedly resulting from the rejection of the Collective Bargaining Agreement filed by the Teamsters National Freight Industry Committee. The Committee asserts that its claim should be in Class XI under the plan. Class XI consists of all unsecured impaired claims in excess of $200 including those arising from the rejection of executory contracts. The Committee's second ground anticipates the debtor's request for "cramdown". The Committee contends that the plan is not "fair and equitable" pursuant to § 1129(b)(2)(B), since a junior claim will retain property in the corporation while the Committee's claim is not being fully satisfied.[11]

Section 1129(b)(1) permits the Court to confirm a plan despite rejection of an impaired class if three conditions are met:[12] (i) that all the requirements of subsection (a)[13] are fulfilled excluding (a)(8); (ii) that the plan does not discriminate unfairly; and (iii) that the plan is "fair and equitable". The National Committee's objections pertain to the requirements of (a)(1), whether the plan complies with the Code's requirements for classification, (a)(10), whether one class of impaired claims has accepted the plan, and the "fair and equitable" requirements of § 1129(b)(2)(B)(ii). The National Committee also questioned the feasibility of the plan which is the test embodied in § 1129(a)(11).[14]

Other than the National Committee's objections, it is clear that the relevant requirements of subsection (a) are satisfied. First, the plan complies with the applicable provisions of the Code. 11 U.S.C. § 1129(a)(1).[15] Second, the debtor as proponent of the plan has complied with all applicable provisions of the Code. *Id.* § 1129(a)(2). Third, there is no evidence which would suggest that the debtor has proposed the plan other than in "good faith and not by any means forbidden by law." *Id.* § 1129(a)(3). *See Connell v. Coastal Cable T.V., Inc.,* 709 F.2d 762 (1st Cir. 1983); 5 *Collier on Bankruptcy* (15th ed.) § 1129.02. Fourth, in Article IV the plan subjects to the Court's approval as reasonable any payment to be made by the debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan ..." 11 U.S.C. § 1129(a)(4). Fifth, the debtor has disclosed the identity and affiliations of all individuals proposed to serve as directors and officers of the reorganized company after confirmation of the plan. *See id.* § 1129(a)(5).[16] Sixth, the plan satisfies the "best interest of the creditors" standard of subsection (a)(7) since if liquidation were ordered, impaired claims would only receive

---

**9.** The Department of Treasury of the State of Michigan also filed an objection due to the debtor's failure to file an appropriate single business tax return for 1982. Subsequently the debtor and the State resolved this dispute and the State withdrew its objection.

**10.** A copy of the plan is attached to this opinion as Appendix "A".

**11.** *See infra* notes 24–26 and accompanying text.

**12.** Section 1129(b)(1) states:
Notwithstanding section 510(a) of this title, if all the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the require-

ments of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
11 U.S.C. § 1129(b)(1).

**13.** 11 U.S.C. § 1129(a).

**14.** *See* 5 *Collier on Bankruptcy* (15th ed.) § 1129.02, at 1129–32.

**15.** The Committee's objection as to classification raises the issue of the conformity of the plan to § 1122(a). This contention is discussed *infra,* at notes 19–23 and accompanying text.

**16.** Subsection (a)(6) is not applicable to this case.

64.4% of their claim while the plan provides for a 70% distribution at the time of confirmation or 100% over 3½ years, the latter having a present value of 88%. Seventh, the plan provides that the holders of claims enumerated in sections 507(a)(1), 507(a)(4) and 507(a)(6) shall receive the cash equal to the allowed amount of such claims on the effective date of the plan. 11 U.S.C. § 1129(a)(9). *See* Treatment of Classes IV and V under the Plan.[17]

The National Committee's objections stem from its desire to have the debtor again obligated under the provisions of the National Collective Bargaining Agreement which the Bankruptcy Court permitted the debtor to reject in December of 1982. The Committee's counsel asserted that what is "at stake" is that U.S. Truck employees work side-by-side with and do the same work as Central Transport employees but earn less. According to the Committee, the fact that these employees work for different companies is irrelevant since both corporations are owned by the same principals. In the Committee's counsel's own words "... so what you are dealing with here is a situation that has been—does contain a great potential for labor dispute explosions."[18] The Committee's counsel further asserted that "... the plan before the Court does not resolve that problem. In fact it aggravates it." The Committee's counsel indicated that during the summer of 1984 a meeting between the National Committee and the membership was conducted in which the membership voted overwhelmingly to strike the debtor if these employees were not afforded the same wages as the Central Transport employees. Presumably, this strike would commence when the National Agreement expires in March of this year. The Committee's counsel continued:

Now that strike vote speaks tellingly to what the membership really wants. And what the membership wants is the conditions of the contract that was rejected in December of 1982. And that is why U.S.—why the Committee has insisted for a long time for as close to that contract as they can get and why they have claimed rejection damages based on that contract for those people.

The Committee's counsel noted further: And I might point out that employees in a situation of this kind have a virtually unique interest. Unlike other creditors who will get paid off and go away the employees of U.S. Truck have a continuity of interest in the ongoing business. They are the ones who will be particularly affected in the event that [U.S. Truck loses its support from Central Transport] ...

Counsel's comment on the support received from Central Transport concerns the favorable arrangement the debtor has received in leasing Central's terminals and other equipment and in Central's stenographic and accounting services. The National Committee's counsel stated that nothing in the plan ensures the continued support of Central. This assertion is incorrect. Upon confirmation of the plan several written lease agreements between Central and the debtor will come into effect. These agreements will secure the present beneficial arrangements with Central for 3 to 5 years.

■ The National Committee's counsel concluded:

... there is nothing in this plan that assures [the employees] of ongoing jobs or as a matter of fact even a labor contract to protect them to the extent that a labor contract could. The employees interests here are, in our opinion, very substantial and they are not adequately treated in this plan.[19]

---

**17.** The remaining requirements of subsection (a)—(a)(10) and (a)(11)—are discussed *infra.*

**18.** The quotations in this section were taken from the stenographer's notes which have not yet been transcribed.

**19.** Initially, the National Committee's counsel's statements suggest that the Committee faults the plan because it does not ensure the Committee's desire to regain the terms of the National Agreement. It appears that the Union contemplates that the plan should somehow provide for a labor contract between the Union and the debt-

As to the National Negotiating Committee's first objection, the Committee argues that it was improperly placed in a class separate from the general body of unsecured impaired creditors because its claim is substantially similar to those claims. The Committee contends that it was placed in a class of its own, Class IX, in order to obtain a consenting impaired class for "cramdown" pursuant to § 1129(a)(10) and (b)(1). According to the Committee its claim should have been placed in Class XI with the other unsecured claims. Although the creditors in Class XI overwhelmingly voted to approve the plan, if the Union claim had been placed in that class, then that class would not have been deemed to have approved the plan because of the size of the Union claim compared to the class.[20]

The plan places the National Committee's claim for damages due to the rejection of the collective bargaining agreement in Class IX. The plan states: "This class shall be impaired. All claims included in Class IX, as allowed and approved by the Court, shall be paid in accordance with the treatment accorded to Class XI claimants." Class XI includes: "All unsecured claims in excess of $200.00 including those arising from the rejection of Executory Contracts." These claims will receive either 70% upon the effective date of the plan or 100% over 3½ years.

■ Section 1122(a) of the Code governs the classification of claims. This section provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Many courts have recognized that this provision implies the converse—that like

claims may not be treated differently. *E.g. In re Mastercraft Record Plating, Inc.*, 32 B.R. 106 (Bankr.S.D.N.Y.1983). Although the phrase "substantially similar" is not defined in the Code, as a general rule unsecured claims normally comprise one class. *See e.g., In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr.S.D.N.Y. 1982); 3 *Norton Bankruptcy Law & Practice*, part 60–p. 7. However, "analysis [which concludes] that 'all unsecured claims are equal' is simplistic and mischievous. There is surely no satisfactory *a priori* rule that some types of unsecured claims may not be 'substantially similar.'" *In re U.S. Truck Company*, 42 B.R. 790, 795 (Bankr.E.D.Mich.1984). The language of § 1122(a) does not establish or even suggest, a rigid standard to be applied to classifications. Rather, this section embodies a liberal, flexible approach, requiring only that "substantially similar" claims be placed together. Many courts and commentators have agreed that § 1122(a) contemplates a flexible standard, grounded in reasonableness and recognizing the particular circumstances of each case. *In re U.S. Truck, supra; In re Huckabee Auto Company*, 33 B.R. 132 (Bankr.M.D.Ga. 1981); *In the Matter of Winston Mills, Inc.*, 1 C.B.C.2d 121 (Bankr.S.D.N.Y.1979); Anderson, *Classifications of Claims*, 55 Am.Bankr.L.J. 99 (1984); Blair, *Classification of Unsecured Claims in Chapter 11 Reorganization*, 58 Am.Bankr.L.J. 197 (1984); 3 *Collier Bankruptcy Manual*, § 1122.05, at 1122–17; *See Scherk v. Newton*, 152 F.2d 747 (10th Cir.1945). Under this standard, the Court must construe and compare the nature of the claims and deter-

---

or. The Bankruptcy Code, however, does not require such an agreement for the confirmation of the plan. Once the collective bargaining agreement has been rejected, the parties further negotiations and agreements are subject to the NLRA and not Bankruptcy Code. *See NLRB v. Bildisco & Bildisco*, —— U.S. ——, 104 S.Ct. 1188, 1200–01, 79 L.Ed.2d 482 (1984). The NLRA provides the National Committee with protections and remedies in their negotiations with the debtor.

20. 11 U.S.C. § 1126(c) provides that a "class of claims has accepted a plan if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan." The rejection of the National Committee would preclude acceptance by Class XI since its claim, being estimated at $2,000,000, would exceed one-third of the total amount of the class claims.

mine the reasonableness of the classification in the circumstances of this case.[21]

The National Committee argues that a line of cases which have not permitted classification for the purpose of obtaining a consenting class [22] govern this case. In those cases the courts ruled that the proponent of the plan of reorganization could not "divide like claims into multiple classes in order to create a consenting class so as to permit confirmation." *In re Mastercraft Record Plating, Inc., supra,* at 109; *In re Pine Lake Village Apartments Co.,* 19 B.R. 819 (Bankr.S.D.N.Y.1982). Those courts generally faced a situation in which an unsecured creditor was classified separately from other unsecured creditors who received more favorable treatment under the plan. By this method the proponent of the plan insured that one class would consent to the plan. The courts recognized that there was no difference in the nature of the claims and that the scheme of classification was for the *sole* purpose of gerrymandering the creditors' vote. Such circumstances are not present in the instant case.

Foremost, the nature of the National Committee's claim is not comparable to the other unsecured creditors. Although the Committee's claim appears similar to the other unsecured creditors' claims because it involves damages from the rejection of an executory contract which will be paid in the same manner, the Committee's claim is substantially dissimilar because of its interests and objectives as compared to other creditors. As the Committee's counsel stated at the hearing, the Union employees have a *"virtually unique interest.* Unlike other creditors who will get paid off and go away the employees of U.S. Truck have a continuity of interest in the ongoing business." (Emphasis supplied). The interest and goal of the Committee is to regain the terms of the National Agreement. The Committee and the Union generally have

treated this claim for damages as being connected or somehow related to the collective bargaining process. For instance, the agreement which was ratified on the local level provided that the claim for damages would be withdrawn if the agreement was fully ratified. In the Committee's counsel own words: "what the membership really wants is the conditions of the contract that was rejected in December of 1982 ... why the Committee has insisted for a long time for as close to that contract as they can get *and why they have claimed rejection damages based on that contract for those people."* (Emphasis supplied). For two years the debtor and the Union have been attempting to negotiate a new collective bargaining agreement. The National Committee has twice refused to approve agreements which were ratified by the membership and the local unions. The Committee has stated that its rejection of these agreements due to their failure to meet substantially, if not completely, the terms of National Agreement. Clearly, the interest and commitment of the Committee is to settle for nothing short of the National Agreement. This interest is probative in evaluating the nature of the Committee's claim and in comparing it to the claims of the other unsecured creditors. Under the scheme of the Code, the purpose of classification in this context is to place similar interests together to obtain a representative vote. Considering the divergent interest of the Committee to the other creditors, the grouping of the Committee's claims with the other unsecured creditors would have destroyed that objective.

Further, the mechanics of the Committee's claim differs substantially from the other unsecured creditors. Pursuant to the Consent Order of January 16, 1985, the National Committee elected to defer any payment on their claim until after extensive discovery and a trial on the merits.

---

**21.** *See In re U.S. Truck Company,* 42 B.R. 790, 795–96 (Bankr.E.D.Mich.1984).

**22.** *In re S & W Enterprise,* 37 B.R. 153 (Bankr.N. D.Ill.1984); *In re Mastercraft Record Plating,*

*Inc.,* 32 B.R. 106 (Bankr.S.D.N.Y.1983); *In re Pine Lake Village Apartments Co.,* 19 B.R. 819 (Bankr.S.D.N.Y.1982).

Only after a tribunal has determined the amount, if any, of the Committee's claim for damages will it be entitled to payment as specified in Class XI of the plan. Similarly, the Committee's claim is for the damages suffered by each individual Union employee. Thus, the Committee's claim unlike that of any other creditor is actually an amalgamation of claims. Moreover, when the bargaining representatives reached an agreement on a new contract in November of 1984, the Union agreed to withdraw its claim for damages. This term again may be part of a future agreement. Hence, also unlike other creditors the Committee's claim may be part of the collective bargaining process. Therefore, for these reasons the classification of claims provided in the plan satisfy the statutory requirements.

Since classification is proper, the acceptance of the plan by the unsecured creditors of Class XI satisfies the requirement of § 1129(a)(10), that a class of impaired creditors must approve the plan. Even if the Court's conclusion concerning classification is in error, Classes VI and VII are composed of creditors with impaired claims which also satisfy the requirement of § 1129(a)(10).[23] Hence, it is proper for the Court to consider the debtor's request for Court ordered confirmation or "cramdown" pursuant to § 1129(b)(1).

Section 1129(b)(1) requires that the plan be non-discriminatory and "fair and equitable" to the dissenting class.[24] The Committee does not contend that the plan discriminates unfairly. The Committee's claim is treated in the same manner as all unsecured claims under the plan. The only

issue is whether the plan is "fair and equitable."

▉ Section 1129(b)(2)(B) establishes the standard to be applied in this context. This provisions states in pertinent part:

(2) For the purposes of this subsection, the condition that a plan be fair and equitable with respect to a class include the following requirements:

(B) With respect to a class of unsecured claims—

\* \* \* \* \* \*

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan an account of such junior claim or interest any property.

This section expressly forbids the equity security holder from receiving or retaining any property on account of its interest under the plan of reorganization if the impaired class of unsecured creditors does not accept the plan. This is a matter of equity and public policy established long ago under the old Bankruptcy Act. *See e.g., Louisville Trust Co. v. Louisville, N.A.C. RR.,* 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 (1899). As proponent of the plan, the equity security holder cannot both discount and discharge prior claims and also retain its ownership interest in the reorganized company unless the secured creditors affirmatively accept that treatment.[25] Otherwise the holder of a junior interest would succeed in subordinating a legal claim entitled to priority as a matter of law. *See e.g., In re Genesee Cement, Inc.,* 31 B.R. 442, 443 (Bankr.E.D.Mich. 1983) ("It is too basic a maxim to bear

---

**23.** The National Committee argued that Classes VI and VII were not actually "impaired" claims. This contention is without merit. Section 1124 of the Code, its legislative history, and many court decisions establish that a creditor is unimpaired only if the plan restores the creditor to its pre-petition position. *In re Blackwelder Furniture Company of Statesville, Inc.,* 31 B.R. 878, 11 B.C.D. 767 (Bankr.W.D.N.C.1983). *See In re Jones* 32 B.R. 951 (Bankr.D.Utah 1983); *In re Barrington Oaks General Partnership,* 15 B.R. 952 (Bankr.D.Utah 1981). These creditors are not so provided for under the plan.

The Committee also asserts that the consent of Class VI does not comply with § 1129(a)(10) because of an arrangement with the alleged "insider". The Committee, however, did not present any evidence of an improper relationship to taint the consent to Class VI. Moreover, this contention does not in any way affect the consent received from Class VII.

**24.** *See supra* notes 12–14 and accompanying text.

**25.** *E.g., In re Genesee Cement, Inc.,* 31 B.R. 442, 443 (Bankr.E.D.Mich.1983).

repetition that an equity security holder's interest can only be retained if trade creditors' claims are fully paid.")

In *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), the Supreme Court recognized that although the equity security holder could not retain its interest, it could participate in the reorganized corporation by providing new capital or consideration. The Court stated:

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, indicated as much in *Northern Pacific R.R. v. Boyd* [228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913)] and *Kansas City Terminal Ry. v. Central Union Trust Co.*, [271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926)]. Especially in the latter case did this Court stress the necessity, at times, of seeking new money essential to the success of the undertaking from the old stockholders. Where that necessity exists and the old stockholders make fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.

*Id.* at 121, 60 S.Ct. at 10. The Court went on to suggest that the contribution should be substantial.

The leading recent case on this issue is *In re Marston Enterprises*, 13 B.R. 514 (Bankr.E.D.N.Y.1981). In *Marston* the debtor-in-possession sought cramdown of a plan in which the equity security holder's interests were extinguished but the plan provided that the holder could repurchase the shares at par value $1 per share. The *Marston* court states:

> There is no statutory prohibition against original shareholders making a substantial necessary capital contribution in consideration for which they received shares of stock in the reorganized corporation. There is also nothing in the Code which precludes the case law which developed under Chapter X of the Bank-

ruptcy Act ... from application to Chapter 11 of the Bankruptcy Code.... There is no reason why investors of new capital who happen to be shareholders, whose equity interest as old shareholders is extinguished, should be disqualified from investing in the reorganized corporation, where their contribution is substantial, as is the case herein. It would not violate the fair and equitable standard.

*Id.* at 518.[26]

■ The plan under scrutiny here treats the interests of the equity security holder, McKinlay Transport, Incorporated in Class XII. McKinlay acquired all of the outstanding shares of the debtor immediately after the Chapter 11 petition was filed. McKinlay is a wholly owned subsidiary of Flanvi Corporation. Agnes Anne Moroun is the sole shareholder of Flanvi. She also holds 15% of the outstanding stock of Cen-Tra, Incorporated which owns Central Transport Incorporated and GLS LeasCo., Incorporated. All of these corporations are involved in the trucking industry. The plan provides that the equity security holder's interests are to be extinguished and that it be permitted to buy all the new shares of the reorganized corporation for $100,000. The National Committee argues that the $100,000 figure is totally inadequate and that the plan thus permits the equity security holder to retain its interest at the expense of creditors. The basic issue, then, is whether the $100,000 amount provided in the plan is "substantial" enough to satisfy § 1129(b)(2)(B)(ii).

The determination of "substantial" contribution is similar to the problem of evaluation. *See* 5 *Colliers on Bankruptcy* (15th ed.) § 1129.03, at 1129–57–1129–74. There is no mathematical formula which can be applied because of the lack of certainty. In determining the general worth of the debtor's stock, the Court must necessarily make determinations regarding the future of the debtor as reorganized, and its possi-

---

**26.** *See e.g., In re Landau Boat Co.*, 13 B.R. 788    (Bankr.W.D.Mo.1981).

ble profits. *See, e.g., In re Landau Boat Co.,* 13 B.R. 788 (Bankr.W.D.Mo.1981).[27]

■ The testimony of two witnesses bears upon this issue: the president of the debtor, John Schroeder, and the public accountant responsible for the various calculations and projections, a Mr. Conway. Schroeder testified that the profits that the debtor had enjoyed recently were due to the implementation of owner/operator operations [28] and favorable lease agreements with Central.[29] Schroeder emphasized the importance of the owner/operator system in the recent success of the company and the necessity of its continuance for future success. Prior to the rejection of the National Agreement, the debtor was required to maintain its own fleet of trucks which consumed a large amount of working capital. Since the change to owner/operator the debtor has been able to save this debilitating operating expense and show profitability. This testimony is supported by the findings of the Bankruptcy Court in its memorandum opinion which permitted the debtor to reject the National Agreement. Schroeder testified, however, that if the debtor was required to abandon the owner/operator system and return to the terms of the National Agreement in April of this year, the profits would certainly end because the debtor would have to purchase its own fleet and again incur substantial maintenance expenses.[30] It would require millions of dollars for the debtor to purchase and maintain its own fleet of trucks. The result would be oppressive to the debtor since it obviously does not have such funds in reserve and because of the diffi-

culty a debtor just emerging from bankruptcy has in obtaining financing for the large amount of capital required.

Schroeder further testified that if the circumstances of the debtor's operations remained unchanged, it is likely that the company will continue its recent success. Yet, Schroeder was properly guarded about the company's future. The main problem or obstacle to the debtor's continued success is the goal of the Union to regain the terms of the National Agreement with the debtor. The National Agreement expires at the end of March, 1985. Although it has not been fully ratified, the agreement the debtor and the local union have been operating under also expires at that time. It seems clear from the statements of the National Committee's counsel and the Committee's actions that the Union will insist upon the elimination of owner/operator operations. As discussed, this could have a devastating effect on the immediate profitability of the debtor. Moreover, it also appears that the membership has targeted the debtor for a strike if it does not meet the Union's terms. In the Committee's counsel's own words, such a work stoppage has the potential of "gobbling up" the debtor.

Conway, an expert in the trucking business and accounting, testified as to the worth of the equity interest of the debtor upon confirmation of the plan. Conway properly recognized that an analysis which simply focused on the recent past earnings of the company was not appropriate. The current income approach requires a strong likelihood of stability to be a meaningful

---

27. In *In re Landau Boat Co.,* 13 B.R. 788 (Bankr. W.D.Mo.1981) the court concluded after reviewing the testimony:

This examination of the financial reports and the operating experience of debtor show that debtor has the potential to be profitable. However, in light of debtor's financial needs, the state of the economy and the fact that the debtor is in a highly competitive business, the Court can only conclude that the probability of debtor making a profit in the next two years is unlikely. The Court, therefore, finds that the new investors are making a substantial investment which exceeds any value

which can be realized from the business in the foreseeable future.
*Id.* at 792

28. *See supra* at note 3 and accompanying text.

29. *See supra* at notes 18–19 and accompanying text.

30. If the debtors circumstances do not change in the next year it appears that it will have an operating ratio of 93%. A drastic or dramatic increase in such expenses would obviously impact severely upon the profitability of the debtor.

method of valuation. Because there were several contingencies in the immediate future of the company this strong likelihood element is problematical at best. First, there were the labor problems of the debtor. In April of this year the debtor may be faced with a strike or having to abandon the owner/operator system. Either possibility would erode the profitability of the debtor. Second, although estimated for the purposes of confirmation, the National Committee's claim for damages could be determined to be as high as $5,000,000 which would also impact upon the profits of the debtor. Third, carriers such as the debtor are generally suffering from hard economic times due to deregulation. As a result, these carriers are not well perceived in the general investment community. Conway reasoned and this Court agrees that these factors must be considered in determining the value of the debtor's equity interest and that the current income approach is inadequate.[31] Conway opined that based upon these factors, the market value for all the shares of the debtor is worth little, if anything at all, due to these risks. He stated that it is highly unlikely that any outside investor would now wish to invest in the debtor under the present circumstances. The expert concluded that $100,000 was not only a fair market price but that it probably was well above what the shares could be sold to the general public.

The National Committee did not present any evidence which in any way contradicted the testimony of these witnesses, nor did it present any evidence at all during the hearing on any matter. Given these facts, the $100,000 which McKinlay Transport will pay for the shares of the debtor must be determined to be "substantial" and in compliance with the requirements of § 1129(b)(2)(B)(ii).[32] This does not mean that the Court views the debtor's success as reorganized as unfeasible. This analysis requires the Court to weigh the possibilities of future profitability. In determining that $100,000 is substantial because of current contract negotiations does not mean that the Court must deem the plan unworkable. Given the company's recent success and the sound approach for reorganization in the plan, there is a substantial likelihood that this debtor will succeed. The debtor's future relationship with the Union may undercut its profitability, but there is optimism in the fact that the membership has approved two agreements which included owner/operator provisions and that the membership approved the plan itself by an overwhelming 95%.[33] These factors suggest that there is hope that an agreement can be reached between the Union and the debtor.

■ The Court recognizes, as alluded to above, that there is a facial inconsistency between its determination that the equity shareholders retention of an interest is permissible and the determination that the

---

**31.** *See supra* at note 27.

**32.** The National Committee also argued that the equity security holder could not participate in the reorganized company unless its participation was crucial to its success. Since the expert witness stated that the $100,000 investment was "important" but not "crucial" to the success of the debtor, the Committee argues that McKinlay cannot participate. Although there is broad language in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939) which might support this position, most recent decisions under the Code do not apply this requirement stringently. *E.g., In re Landau Boat Co.*, 13 B.R. 788 (Bankr.W.D.Mo.1981); *In re Marston Enterprises*, 13 B.R. 514 (Bankr.E.D.N.Y.1981). *See In Re Genesee Cement, Inc.*, 31 B.R. 442, 443 (Bankr.E.D.Mich.1983).

Further, the National Committee is merely hairsplitting in contending that although infusion of capital is "important," it is not "crucial." The testimony clearly established that with the potential labor problems of the debtor and the possibility of a determination that the Union is entitled to extensive damages due to the rejection of the contract, such capitalization would be essential to the debtor's future success.

**33.** The employees have claims independent of the alleged damages arising from the rejection of the collective bargaining agreement. These claims are contained in Class III which consists of the unsecured claims for wages or salaries earned three months prior to the commencement of the bankruptcy proceedings.

plan is feasible. This inconsistency arises from the uncertainty regarding the collective bargaining results. However, it must be remembered that the approaches to those issues are different: the first primarily is viewed from the perspective of the investment community. The second is viewed from the standpoint of permitting the bankruptcy laws to work their purpose, i.e., fair provision for payment to creditors and the reasonable opportunity of the reorganized company to continue in the trucking business. *See* 5 *Collier On Bankruptcy* (15th ed.) § 1129.02, at 1129–32—1129–35. While prospects may appear to be bleak due to labor problems, there are some indications, as noted above, that the parties can negotiate a contract that will be fair and equitable and yet permit a viable reorganized business. The alternative is, of course, a drastic one—liquidation. Attending that alternative would be fewer dollars for creditors and the loss of jobs. "Feasibility" does not, nor can it, require the certainty that a reorganized company will succeed. The Court in this case is persuaded that taking into consideration the pertinent factors, including the consolidation of operations, favorable lease agreements, energetic management and the recent upswing in profitability, the likelihood of continued profitability is substantial. The overhanging cloud of labor problems is considerable, but it is also a fact of life in any similar business and may intrude at any time, just as may a general economic downturn or a major cutback in automobile production. No one can be a guarantor of business success but the totality of circumstances here and the lack of any opposing evidence, except for the raising of the labor spectre bodes well for the reorganized company.

■ Finally, the National Committee attacks the feasibility of the plan under § 1129(a)(11) by asserting that the current lease arrangements with Central are too tenuous and could lead to the demise of the debtor at the hands of this competitor. This was also the concern of the Bankruptcy Court in previous proceedings.[34] However, the lease agreements which will become effective upon confirmation of the plan will prevent Central from withdrawing its support in the near future.[35] Therefore, the debtor's relationship with Central does not affect the feasibility of the plan.

In conclusion, the requirements of § 1129(b) have been satisfied and the Court ORDERS that the debtor's Fifth Amended Plan of Reorganization be and the same is hereby confirmed.

IT IS SO ORDERED.

## APPENDIX A

### FIFTH AMENDED PLAN OF REORGANIZATION

U.S. Truck Company, Inc., a Michigan corporation, hereinafter referred to as "Debtor", proposes and files this Fifth Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code as follows:

### ARTICLE I

### DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

CLASS I  Expenses of administration of the attorneys for Debtor, Attorneys for the Creditors' Committee, Secretary of the Creditors' committee, and accountants of the Debtor and Creditors' Committee.

34. The Bankruptcy Court was concerned that since Central provided essential operations to the debtor pursuant to oral leases terminable at any time, that the debtor was vulnerable to the whims of Central, a competitor. *In re U.S. Truck Co.,* 44 B.R. 311 (Bankr.E.D.Mich.1984).

35. The Committee argues that Central has decided to allow the debtor to "flower" but it could at any time in the future "dry it up." The Committee suggests that the latter is highly likely because Central is a competitor of U.S. Truck. This argument lacks logic. There appears to be no reason why Central would withdraw its support at this time. If Central simply wished to eliminate U.S. Truck as a competitor, it could have liquidated the debtor. However, by being instrumental in its rehabilitation, it seems more likely that the owner of Central is attempting to gain a greater share of the trucking market by its ownership of U.S. Truck.

CLASS II       All expenses of administration other than CLASS I.

CLASS III      Unsecured claims for wages or salaries, including vacation pay, which were earned within three months prior to the commencement of these reorganization proceedings, to the extent of $2,000.00 for each such employee.

CLASS IV       Unsecured claims for contributions to employee benefit plans, arising from services rendered within 180 days prior to the commencement of these reorganization proceedings limited to the extent entitled to priority under Sec. 507(a)(4) of the Bankruptcy Code.

CLASS V        Taxes. All tax claims of governmental units that are entitled to priority under Section 507(a)(6) of the Bankruptcy Code.

CLASS VI       Secured claim of Manufacturers National Bank of Detroit.

CLASS VII      Secured claim of John Graham, Trustee of Transportation Services, Inc. ("Graham").

CLASS VIII     Workers' Compensation Claims. This Class shall be composed of all claims for Michigan Workers Disability Compensation benefits arising before the filing of the Chapter 11 Petition.

CLASS IX       Unsecured claims (disputed) for damages ($5,002,321) allegedly resulting from rejection of Collective Bargaining Agreement filed by the Teamsters National Freight Industry Negotiating Committee on behalf of its local unions and their members covered by the 1982–85 National Master Freight Agreement, its supplements and riders and the office and garage contracts (hereinafter "rejection claims").

CLASS X        Unsecured creditors holding claims of $200.00 or less; providing, however, that any creditor having a valid claim in excess of such amount may reduce its claim to $200.00 and by so doing shall be entitled to the provisions hereinafter made for the payment of this Class of claims.

CLASS XI       All unsecured claims in excess of $200.00 including those arising from the rejection of Executory Contracts.

CLASS XII      The equity interest of the stockholder of the Debtor.

## ARTICLE II

### SPECIFICATION OF TREATMENT OF CLASSES OF CLAIMS OR INTERESTS NOT IMPAIRED UNDER PLAN AND THOSE IMPAIRED UNDER PLAN

CLASS I        The claims of all CLASS I creditors, as allowed and approved by the Court, shall not be impaired and shall be paid in full upon the Effective Date of the Plan.

CLASS II       The claims of all CLASS II creditors shall not be impaired and shall be assumed by the reorganized Debtor and paid in the ordinary course of business, or as otherwise ordered by the Court.

CLASS III      All claims included within CLASS III to the extent same shall be allowed and approved by the Court shall not be impaired and shall be paid in full upon the Effective Date of the Plan.

CLASS IV       All claims included within CLASS IV to the extent same shall be allowed and approved by the Court shall not be impaired and shall be paid in full upon the Effective Date of the Plan.

CLASS V Tax claims of governmental units entitled to priority under 11 USC Section 407(a)(6) shall be paid in full upon the Effective Date of the Plan. This class shall not be impaired.

CLASS VI The Debtor proposes to surrender the properties which are subject to the mortgage of Manufacturers National Bank of Detroit; or to retain such properties upon achieving an agreement with the Bank to have the secured indebtedness restructured upon terms satisfactory to the interested parties prior to the date fixed for confirmation of the Plan.

CLASS VII The secured claim of Graham in the amount of One Hundred Ninety-One Thousand Three Hundred Ten and 37/100 ($191,310.37) Dollars shall be impaired and shall be settled and satisfied by:

a) Payment of $15,000.00 by the Debtor to Graham on the Effective Date of the Plan;

b) The balance of the secured claim in the amount of $176,310.00 shall be treated as a CLASS XI Claim and paid in accordance with the treatment accorded to such CLASS under the Plan;

c) Concurrently with the receipt of the $15,000.00 payment, Graham shall terminate his security interests which he holds upon the rolling stock of the Debtor, and shall also discharge mortgages which he holds upon certain real estate of the Debtor.

CLASS VIII The claims included in CLASS VIII shall not be impaired. Prior to the commencement of this case, the Debtor was a Self-Insured Employer under the Michigan Workers Disability Compensation Act of 1969 ("Act"). Thereafter, Standard Workers Compensation Insurance was obtained by the Debtor-in-Possession from the National Union Fire Insurance Company of Pennsylvania. As to injuries sustained by its employees during the period that the Debtor was a Self-Insured Employer, the Debtor shall pay or cause to be paid all Workers Compensation Benefits to Pre-Chapter 11 Claimants who are found to be entitled to such benefits in accordance with the provisions of the Act.

CLASS IX This Class shall be impaired. All claims included in CLASS IX, as allowed and approved by the Court, shall be paid in accordance with the treatment accorded to CLASS XI claimants.

CLASS X All claims included in CLASS X shall not be impaired and shall be paid in full upon the Effective Date of the Plan.

CLASS XI This CLASS shall be impaired. All Debts included in CLASS XI shall be paid and satisfied in the following manner. The Creditors shall have the right to elect either of the following options. Failure to make an election by any creditor shall be an automatic election of Option 2:

Option 1—Seventy percent (70%) in cash upon Effective Date of the Plan; or

Option 2—One Hundred percent (100%) of said debts which shall be paid, without interest, as follows:

| Date of payment | Percentage of principal amount of claim to be paid |
|---|---|
| Effective Date of Plan ("Effective Date") | 30% |
| Six months after Effective Date | 10% |
| One year after Effective Date | 10% |
| One and one-half years after Effective Date | 10% |
| Two years after Effective Date | 10% |

| | |
|---|---|
| Two and one-half years after Effective Date | 10% |
| Three years after Effective Date | 10% |
| Three and one-half years after Effective Date | 10% |

As collateral security for the deferred installments payable to CLASSES IX and XI creditors, the Debtor will grant to Frank J. Hohman as Trustee for the benefit of such Class of Creditors, a mortgage and security interest in all of the Debtor's properties. This commitment is embodied in a Security Agreement, which has been structured between the Debtor and the Creditors' Committee.

CLASS XII    The interests included in CLASS XII shall be impaired. The capital structure of the Debtor, with appropriate amendments to its Articles of Incorporation and By-Laws shall be changed to:

A.  Eliminate and cancel all existing common stock both that which is authorized but not issued as well as that which is issued and outstanding.

B.  Provide for a new class of common stock consisting of 100,000 shares authorized to be created, each one to be no par value.

McKinlay Transport, Inc. shall purchase upon the Effective Date of the Plan 100,000 shares of new common from the reorganized Debtor for the sum of $100,000.

## ARTICLE III

### EXECUTORY CONTRACTS

A.  The Debtor may reject any executory contract that the Debtor hereafter may determine is burdensome, which rejection may be accomplished by filing with the Court an application to reject said contract together with an affidavit of mailing of such notice upon all parties affected by such rejection on or before the entry of an Order by this Court of confirmation of the Debtor's Plan of Reorganization and causing a hearing to be held on said notice either before or after confirmation. The Debtor may withdraw and cancel its application and notice to reject by filing written notice of such withdrawal together with affidavit of mailing thereof upon all parties affected thereby with the Court on or before the hearing by this Court.

B.  The Debtor assumes all executory contracts in existence as of the date of the filing of the Chapter 11 case which Debtor does not apply for rejection thereof prior to the entry of an Order confirming the Debtor's Plan of Reorganization.

## ARTICLE IV

### RETENTION OF JURISDICTION OF THE COURT

A.  The Court shall retain jurisdiction to allow and disallow claims not allowed or disallowed prior to confirmation. Debtor shall have 60 days after the date of confirmation to object to the timely claims of any creditors. There shall be no time limit imposed upon Debtor to object to any claim not timely filed or deemed filed.

B.  The Court shall further retain jurisdiction to hear and determine any controversy pending as of the date of confirmation before this Court and for the purpose of granting any injunction as may be necessary or desirable to effectuate the purpose of the Plan of Reorganization.

C.  The Court shall further retain jurisdiction to enter orders allowing compensation to those persons so entitled to receive compensation pursuant to the Bankruptcy Code, and to hear and determine all controversies relating to the obligations of the Debtor-in-Possession incurred in the conduct of the Debtor's business prior to confirmation.

## ARTICLE V

### TITLE TO PROPERTY

Upon the Effective Date of the Plan, the Debtor shall be revested with its assets, subject only to outstanding liens which are not avoidable by the Debtor under the provisions of Title 11 of the United States Code, and entitled to manage its affairs without further order of the Court.

## ARTICLE VI

### EFFECTIVE DATE OF THE PLAN

This Plan shall be effective on the 11th day after the date of the Order confirming the Plan, provided, however, that no appeal as to the Order of Confirmation has been filed. In the event such an appeal is filed, this Plan shall be effective as of the date the Order of Confirmation becomes final and binding on all parties.

## ARTICLE VII

### MODIFICATION OF THE PLAN

The Debtor may propose amendments or modifications of the Plan at any time prior to confirmation, with leave of the Court, upon notice to the Creditors' Committee. After confirmation, the Debtor may, with approval of the Court, and so long as it does not materially or adversely affect the interests of creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan, or in the order of confirmation, in such manner as may be necessary to carry out the purposes and effect of the Plan.

## ARTICLE VIII

### MISCELLANEOUS PROVISIONS

I. NEGATIVE COVENANTS:

Debtor agrees that until all of the payments provided for herein have been made to all of the creditors constituting CLASSES IX and XI without the written consent of the Creditors' Committee or its designee, it shall not:

(a) Declare or pay any dividend on its capital stock, whether in cash, stock or any other form, nature, or description.

(b) In any way liquidate, dissolve, or consent to a merger, acquisition, or consolidation with any other company or entity.

(c) Make loans to officers, directors or shareholders, or guarantee such loans made by others.

(d) Create or permit to exist any lien or encumbrance upon any of its inventories, whether now owned or hereafter acquired.

(e) Sell, transfer, or otherwise dispose of assets of the Debtor except (i) in the ordinary course of business, (ii) or surplus rolling stock, (iii) or surplus real estate.

(f) Execute and deliver any assignment for the benefit of creditors.

II. POSITIVE COVENANTS:

Debtor agrees that until all payments provided for herein have been made to all of the creditors constituting CLASSES IX and XI, without the written waiver of a majority of the Committee or its designee, it shall:

(a) Maintain full, accurate, and complete books of account with respect to all transactions, property, and business of the Debtor and cause such books and reports

to be opened for reasonable inspection by the Secretary of the Committee or his agents.

(b) Furnish to the secretary of the Creditors' Committee and its counsel within 45 days of the close of each quarter or within 10 days after completion, whichever is sooner, a quarterly financial report of the Debtor's operations, certified to by the Chief Financial Officer of the Debtor that such report is true and correct in all material respects to the best of said officer's knowledge, information and belief or certified to by the accountants to the Debtor.

(c) Furnish to the secretary of the Creditors' Committee and its counsel within 90 days of the close of each fiscal year or 30 days after receipt by the Debtor, whichever is sooner, the following items which shall be certified to by the Chief Financial Officer of the Debtor that the same is true and correct in all material respect to the best of said officer's knowledge, information and belief or certified to by the accountants of the Debtor:

(i) an annual report;

(ii) a certification that as to the best of his knowledge there are no defaults under this Plan.

(d) At all times employ a certified public accounting firm reasonably acceptable to the Committee.

## III. CREDITORS' COMMITTEE/RIGHTS AND POWERS:

As long as any payments required to be made under the Plan remain unpaid, the Committee shall consist of the persons appointed pursuant to the provisions of the Bankruptcy Code and who are serving as such at the time the Plan is confirmed. In the event that a vacancy occurs in the Committee by reason of death or resignation or because a Member of the Committee shall no longer be employed by a general creditor of the Debtor, the vacancy created shall be filled within thirty (30) days thereafter by the general creditor with whom the former Member was employed or affiliated. In the event that the general creditor fails to designate a successor to serve on the Committee, the vacancy shall be filled by a designee of a majority of the remaining Members of the Committee from among the employees or representatives of a general creditor. The Committee shall function as such, whether or not the vacancy is filled. If the employer of any Member of the Committee shall assign its claim or release the Debtor from payment of the balance of its claim the Member of the Committee representing that general creditor shall be deemed to have resigned from the Committee and in such case, the vacancy created thereby shall not be filled.

A majority of the Committee shall constitute a quorum qualified to act, and the Committee shall act by a majority vote of that quorum. The committee may act on the consent of a majority of the Members of the Committee without the conduct of a meeting. Meetings of the Committee shall be convened upon such notice as the Chairman or counsel to the Committee shall deem appropriate and necessary, including, without limitation, written, telegraphic or oral notice. Any Member of the Committee may designate a proxy for one or more of the meetings, which designation may be oral unless requested to be made in writing by the Chairman of the Committee.

The individual members of the Committee shall serve without compensation.

The Committee shall have the power and right to waive or excuse performance by the Debtor of any condition or covenant on the part of the Debtor to be performed under this Plan, which waiver or excuse shall be binding upon the general unsecured creditors herein.

The Committee shall have the power and right to postpone the time of payment of any of the payments provided for in the Plan, in whole or in part, for one or more periods, which individual period shall not exceed three (3) months and which postponement shall be binding on the general unsecured creditors herein.

The Committee shall have the power to form a subcommittee consisting of not less than three Members of the Committee with said subcommittee having all of the powers vested in the Committee herein.

The Committee may consult with counsel, accountants and agents, and their opinion shall be full protection and justification to the Committee, its Members, and the firms by whom they are employed for anything done or admitted or suffered to be done in accordance with said opinion. The Committee and its Members shall not be required to give any bond for the faithful performance of its/their duties hereunder.

Anything herein to the contrary notwithstanding, on completion of the payments to the CLASSES IX and XI creditors pursuant to the terms of the Plan, the duties, powers, and responsibilities of the Committee and its agent shall terminate forthwith, and the Committee shall dissolve.

The Committee shall have the additional and further powers and rights that may be necessary and incident to the effectuation of any and all terms of the Plan.

The Committee may circularize such information and reports that, in the discretion of the Committee, are deemed advisable in order fully to inform the creditors of the Debtor concerning the business operations of the Debtor and matters relevant to the purposes of the Plan.

Neither the Committee, its Members, nor the firms by whom they are employed shall be liable for the act, default or misconduct of any Members of the Committee, nor shall any Member be liable for anything but his own wilful misconduct or fraud, and the Committee, its Members, and the firms by whom they are employed shall not be answerable or liable for the act, default, misconduct, or fraud of any agent or any of the persons employed by or acting for or on behalf of the Committee.

The Committee shall have the right to utilize the services of attorneys, accountants, secretaries, or any other agents which, in the discretion of the Committee, are necessary to perform the duties of the Committee. The Debtor, if the services are incurred because the Debtor makes a request of the Committee to modify or waive the payment provisions of the Plan, or if the services are incurred in connection with any material failure by the Debtor to comply with the terms of the Plan, shall pay reasonable fees and expenses incurred by agents of the Committee subsequent to confirmation without the necessity of obtaining Court approval, which fees and expenses shall be the subject of bills to be submitted by said agents on a periodic basis, not to exceed monthly, and which bills shall be paid within thirty (30) days of such presentment.

## IV. EVENTS OF DEFAULT:

A. The occurrence of any of the follwoing shall constitute an event of default under the Plan:

(a) Failure to make any of the payments as provided for, pursuant to the Plan, or the material breach of any terms, conditions, or covenants of the Plan. In the event of such a default, in payment or material breach of any of the terms, conditions, or covenants, the Committee shall give written notice to the Debtor of any such default or breach, and the Debtor shall have thirty (30) business days from receipt of said notice within which to cure the same.

(b) The Debtor shall file or have filed against it any voluntary or involuntary Petition under the Bankruptcy Code of the United States (excluding the Petition herein) or any insolvency statute of any state of the United States; providing that, as to an involuntary petition, which is not dismissed within ninety (90) days.

(c) The appointment of a receiver or trustee under any provision of the Bankruptcy Code of the United States or any insolvency statute of any state of the United States, unless removed within ninety (90) days.

(d) The entry of any final judgment resulting in any lien, levy, or execution against the assets of the Debtor, which is not either: (i) paid within 90 days, or (ii) the enforcement thereof stayed, or (iii) appealed within the appeal period.

(e) Any financial statements or other written statements furnished by the Debtor to the Committee containing any intentionally untrue statement of a material fact or intentionally omits a material fact which is necessary in order to make the same not misleading.

(f) The occurrence of any event of default as described herein, without the written consent of the Committee shall entitle the Committee to declare all of the deferred indebtedness immediately due and payable. The failure or delay by the Committee to declare an event of default shall not constitute or be a waiver or release of any right of the Committee to declare an event of default.

## V. OTHER PROVISIONS:

All references in the Plan to the written consent of the committee shall be deemed to refer to a document executed by the Committee by its Chairman, counsel, or other party as approved by the Committee, and any reference herein to the written consent of the Debtor shall be by a document executed by the President of the Debtor or such other party as is designated in writing by the Debtor.

All references herein to the reasonable request of data by the Committee shall be deemed to only include requests for data by either the attorneys for the Committee, or the Secretary of the Committee.

All references to distribution of data for notices or otherwise shall be construed as follows:

(a) To the Debtor:
　1. Debtor; and
　2. Counsel for the Debtor.
(b) To the Committee:
　1. Secretary to the Committee; and
　2. Attorneys for the Committee.

All headings utilized herein shall not be construed to be of any substantive effect and are utilized solely and simply for reading convenience.

## VI. DISTRIBUTION OF FUNDS:

Prior to the entry of an Order of Confirmation, the Debtor shall open an account entitled "Confirmation Account", into which it shall deposit all funds necessary to satisfy the amount distributable on the Effective Date of the Plan, as fixed by Court order. Debtor shall not distribute any funds to any party other than the parties entitled to the same pursuant to the Plan except upon order of the Court. Proof of a necessary deposit adequate to satisfy the obligations identified in the preceding sentence shall be provided to the Committee prior to entry of the order of Confirmation.

All payments to be made subsequent to the entry of the Order of Confirmation shall thereafter likewise be deposited into the "Confirmation Account" prior to the date upon which such distribution is to be made, and no distribution except to the parties to receive the same pursuant to the terms of the Plan shall occur without further order of the Court.

The Debtor shall provide to the Secretary of the Committee a certification executed by the Chief Financial Officer or Chief Executive Officer that all distributions at all distribution dates have been made within 14 days after the distribution date(s). To the extent a distribution to a particular creditor is not made, the amount and reason for the same shall be specified.

The provisions contained herein shall constitute further covenants of the Debtor and shall be governed by the events of default as described herein.

U. S. TRUCK COMPANY, INC.,
a Michigan corporation,

JOSEPH S. RADOM, P.C.

By: /s/ John Schroeder

Its President

By: /s/Joseph S. Radom
Joseph S. Radom (P19185)
Attorneys for Debtor
29201 Telegraph Road, Suite 400
Southfield, Michigan 48034
(313) 352-3322

Dated: December , 1984