HEANEY, Circuit Judge.
These appeals by James and Mary Ahlers raise important questions of bankruptcy law, particularly as that law relates to farmers who have filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. We hold that the bankruptcy court may, as a condition to maintaining a stay of proceedings by creditors against the debtors’ property, require that the debtors furnish adequate protection to the secured creditors to protect against further loss to those creditors. Adequate protection is to be determined on a case-by-case basis by the bankruptcy court in accordance with the following guidelines: (1) protection is ordinarily to be given for the interim period beginning with the date that the secured creditor could, under state law, obtain possession of the collateral, sell that property, and reinvest the proceeds, and ending with the date that the plan of reorganization is confirmed or dismissed; (2) the value of the property is to be determined as of the date that adequate protection payments are required; (3) crops in the ground, to the extent that they are not otherwise encumbered, may serve in whole or in part as a basis for adequate protection; and (4) payment for such protection may be made after the crop is harvested rather than on a monthly basis.
The bankruptcy court should not approve a plan of reorganization unless it is feasible. In determining feasibility, the court should recognize existing realities, that is, the values of the land, the equipment, and the inventory as of the date that the plan is confirmed. Thus, the secured debt should be restructured to reflect values as of the date of confirmation. The bankruptcy court should not approve the plan unless it appears reasonably probable that the farmer can pay the restructured *392 secured debt, over a reasonable period of time, at a reasonable rate of interest, in the light of farm prices and farm programs as of the date of confirmation.
To insure that the plan is fair and equitable and protects the unsecured creditors, the plan should require that any cash flow from the operation of the farm in excess of that anticipated in the plan be paid to the unsecured creditors on a pro rata basis, until such time as the unsecured creditors are paid in full without interest. Moreover, the plan should require that if the land is sold during the pendency of the plan, and if the unsecured creditors have not been paid in full before that date, any proceeds exceeding those necessary to pay the secured debt be shared on an equitable basis between the debtor and the unsecured creditors. Finally, the court should not permit the prejudgment seizure of equipment and machinery necessary to carry out the plan even if the creditors offer to post a bond.
We recognize that, under a plan of reorganization, secured creditors become unsecured to the extent that their allowed claim exceeds the value of their interest in the collateral. We hold, however, that neither these nor other unsecured creditors can prevent the plan from being approved on the basis of the absolute priority rule if the plan meets the requirements outlined herein and if the debtor agrees to contribute his experience, knowledge, and labor to the successful implementation of the plan.
I. BACKGROUND.
James and Mary Ahlers farm approximately 840 acres of land in Nobles County, Minnesota. They own 560 acres, and rent the remaining 280 acres. To finance their operation, they entered into four separate financing agreements with the Federal Land Bank between December, 1965, and January, 1982. To secure these loans, the Ahlers gave the Federal Land Bank a first mortgage on four separate parcels of their farmland. These parcels of land, and the principal balances of the loans they secured as of November 30, 1984, are as follows:
Parcels Principal Balance
Parcel A (240 acres) $335,403
Parcel B (160 acres) $152,168
Parcel C (80 acres) $ 31,500
Parcel D (80 acres) $ 6,783
The Federal Land Bank’s security interests are not cross-collateralized.
The Ahlers also entered into several financing agreements with the Norwest Bank of Worthington, Minnesota (“Nor-west”) between May, 1982, and April, 1984. To secure these loans, the Ahlers gave Norwest a second mortgage on their farmland, and a first mortgage on their machinery and equipment, crops, livestock, and other farm proceeds. As of November 30, 1984, the Ahlers owed Norwest $450,468 in principal and accrued interest. Norwest’s security interests are all cross-collateralized. The Ahlers also owe John Deere Credit Corporation $35,791, secured by a combine, the Commodity Credit Corporation $3,337, secured by a grain bin, and General Motors $2,900, secured by an automobile. The value of land in southwest Minnesota[1] and the value of used farm machinery have both declined markedly since the Ahlers entered into the financing agreements outlined above. Moreover, commodity prices have declined, and inclement weather has frequently played havoc with yields. Thus, the Ahlers have been unable to make payments on interest and principal, and the secured creditors are substantially undersecured.
On November 16, 1984, Norwest commenced a replevin action against the Ahlers in state court to recover possession of the Ahlers’ equipment and machinery pursuant *393 to Minn.Stat.Ann. § 565.23 (West Cum. Supp.1985). Fourteen days later, the Ah-lers filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq., thereby staying the state court replevin proceedings. See 11 U.S.C. § 362(a). Norwest and the Federal Land Bank filed motions for relief from the automatic stay and for adequate protection. On February 27, 1985, the bankruptcy court held an evidentiary hearing on these motions.
In an order issued March 15, 1985, the bankruptcy court stated that Norwest and the Federal Land Bank, as undersecured creditors, were
entitled to compensation as adequate protection for the delay of enforcing contractual repossession and foreclosure rights during the interim between the filing of the petition and confirmation of the plan. It is the present value of that interest, the opportunity lost, that must be protected.
In re Ahlers, No. 3-84-2206, slip op. at 5 (Bankr.Minn. March 15, 1985).
It then held that the Ahlers would be required to make monthly payments of interest on the current value of the collateral in order to maintain the section 362 stay. It decided that the Ahlers’ offer of a lien on the following year’s crops did not constitute adequate protection, and that the Ah-lers did not otherwise have sufficient funds to provide Norwest and the Federal Land Bank with adequate protection in the form of monthly interest payments on the value of the collateral. For these reasons, it granted the motions for relief from the automatic stay.[2] The Ahlers appealed this order to the district court. It affirmed on October 22, 1985. In addition, pursuant to this Court’s August 8, 1985, order, the district court reviewed the feasibility of the Ahlers’ reorganization plan and found that the plan had no reasonable prospect of success.
Eleven days after the bankruptcy court had entered its March 15, 1985, order granting Norwest’s and the Federal Land Bank’s motions for relief from the section 362 stay, the Ahlers removed Norwest’s replevin action from state court to the bankruptcy court. The bankruptcy court, concerned that the state replevin action was not a core proceeding, indicated that it might abstain and remand the replevin action to the state district court unless the parties consented to the bankruptcy court’s jurisdiction over the matter. On May 24, 1985, the Ahlers and Norwest stipulated that the replevin action was a core proceeding, which could be heard and determined by the bankruptcy court. See 28 U.S.C. § 157(c)(2). Thereafter, Norwest filed a motion in the bankruptcy court for prejudgment seizure of the property, together with an offer of bond, pursuant to Minn.Stat. Ann. §§ 565.23 and 565.25 (West Cum. Supp.1985). On June 25, 1985, the bankruptcy court held a hearing on Norwest’s motion, and on July 8, 1985, entered an order granting this motion. The Ahlers appealed this order, and on October 28, 1985, the district court affirmed.
The Ahlers now. appeal from the district court’s October 22 and October 28 orders. They contend that the bankruptcy court erred in granting Norwest and the Federal Land Bank relief from the section 362 stay. They also appeal the October 28 order, contending that the Minnesota replevin statute is unconstitutional, and that the bankruptcy court did not have jurisdiction to rule on Norwest’s motion for prejudgment seizure pursuant to that statute.
II. DISCUSSION.
A. The district court erred in defining the elements of adequate protection.
The filing of a Chapter 11 bankruptcy petition results in an automatic stay of all acts by creditors to enforce their liens against the debtor’s property. 11 U.S.C. § 362(a). The purpose is twofold: first, to give the debtor a “breathing spell” from his creditors;[3] and second, to prevent one *394 creditor from rushing to enforce its lien to the detriment of the other creditors.[4] The impact of the automatic stay is tempered by certain creditor safeguards, one of which is the secured creditor’s right to adequate protection of its interest during the bankruptcy proceedings. 11 U.S.C. § 362(d).
Although adequate protection is not specifically defined in the Bankruptcy Code, Congress intended that a debtor’s offer of adequate protection should, as nearly as possible under the circumstances of the case, provide the creditor with its bargained-for rights. In re Briggs Transportation Co., 780 F.2d 1339 (8th Cir.1985); In re Martin, 761 F.2d 472, 476 (8th Cir.1985); see also H.R.Rep. No. 595, 95th Cong., 1st Sess. 339, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6295 (“the purpose of [adequate protection] is to ensure that the secured creditor receives in value essentially what he bargained for”). However, Congress expressly did not state how these bargained for rights were to be valued, nor when this valuation was to occur.
The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principles. It is not intended that the courts will develop a hard and fast rule that will apply in every case. The time and method of valuation is not specified precisely, in order to avoid that result. * * * The flexibility is important to permit the courts to adapt to varying circumstances and changing modes of financing.
H.R.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad.News at 6295.
Thus, while it is agreed that a secured creditor should receive adequate protection of its interest during an automatic stay, any adequate protection determination must necessarily turn on the unique facts presented in each individual case. See, e.g., In re Briggs, 780 F.2d at 1348. These factual findings are subject to the clearly erroneous standard of review, In re Martin, 761 F.2d at 474; Bankr.R. 7052, and to this Court’s right to correct errors of law. Martin, 761 F.2d at 475 (quoting Bose Corp. v. Consumer Union of United States, Inc., 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984)).[5]
*395 1. The starting date for adequate-protection payments.
The bankruptcy court held that the Federal Land Bank and Norwest were entitled to adequate protection payments in the form of interest on the value of the collateral securing their loans. This conclusion was based upon the premise that due to the automatic slay, the Federal Land Bank and Norwest were unable to immediately foreclose, liquidate the collateral, and reinvest the liquidation proceeds. See In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir.1984). It held that the Federal Land Bank was entitled to monthly adequate protection interest payments as of January 1, 1985 (date of the Ahlers’ post-petition default on the Federal Land Bank loans), and that Norwest was entitled to monthly adequate protection interest payments as of February 27, 1985 (date of the evidentiary hearing). It found that the Ah-lers did not have sufficient funds to make these monthly payments, and that a lien on the following year’s crops could not constitute adequate protection. Accordingly, it granted the Federal Land Bank’s and Nor-west’s motions for relief from the automatic stay.
A secured creditor is entitled to adequate protection of its security interest. That protection may include compensation to a creditor, in the form of post-petition interest payments, for the delay in enforcing the creditor’s foreclosure rights. In re Briggs Transp. Co., 780 F.2d 1339, 1350 (8th Cir.1985). Thus, we cannot say as a matter of law that the bankruptcy court erred in requiring post-petition interest payments. The question, then, is the timing and amount of these payments.
The concept of providing a secured creditor with adequate protection in the form of interest on the value of the collateral is premised on the theory that a secured creditor bargains for the right to take possession of the collateral and sell it in the event that the debtor defaults. American Mariner, 734 F.2d at 435 (this right constitutes an “interest in property” that is “created and defined by state law”). To the extent that a debtor can, by filing a bankruptcy petition, preclude or delay a secured creditor from exercising this right and reinvesting the liquidation proceeds, the creditor has been deprived of this benefit of its bargain. Thus, adequate protection payments in the form of interest are designed to insure that the secured creditor receives the benefit of its bargain by placing it in essentially the position it would have been in absent the filing of a bankruptcy petition. See H.R.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad.News at 6295. Accordingly, in fashioning adequate protection payments, the bankruptcy court must determine the date when the creditor, absent the filing of a bankruptcy petition, could have taken possession of the collateral under state law and could have sold it to a third party, the amount that the creditor would have realized at this sale, and the creditor’s expected return upon reinvestment.
Payments to protect the creditor’s right to reinvestment return on foreclosure proceeds should not begin until, under state law, the creditor could have taken possession of the collateral, sold it to a third party, and reinvested the proceeds. American Mariner, 734 F.2d at 435 n. 12 (“to avoid overcompensating the secured creditor, the timing of adequate protection should take account of the usual time and expense involved in repossession and sale of collateral.”); see also In re Bear Creek Ministorage, Inc., 49 B.R. 454, 458-59 (Bankr.S.D.Tex.1985); In re South Village, Inc., 25 B.R. 987, 996 n. 14 (Bankr.Utah 1982).
Before the bankruptcy court considers the usual foreclosure delays associated with the particular collateral involved, it must first determine the date to which these delays will be added. If the secured creditor has commenced foreclosure proceedings prior to the filing of the bankruptcy petition, the starting date should be the date foreclosure proceedings were commenced. If, however, the secured creditor has not commenced foreclosure proceedings prior to the filing of the bankruptcy petition, the starting date should be the date that the creditor moves for adequate protection in the bankruptcy court.[6] To *396 the appropriate date, the bankruptcy court should add the usual foreclosure delays associated with the particular collateral involved.
With respect to the farmland, Minnesota law provides that six-weeks published notice must be given before a foreclosure sale. Minn.Stat.Ann. § 580.03 (West 1947). In addition, the mortgagor has the exclusive right to redeem the realty for twelve months following the foreclosure sale.[7] Minn.Stat.Ann. §§ 580.23, subd. 2, and 580.24 (West Cum.Supp.1985). During this twelve-month redemption period, the mortgagor is entitled to possession, rents, and profits of the real estate. Johnson v. First National Bank of Montevideo, 719 F.2d 270, 276 (8th Cir.1983), cert. denied, 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). Because the purchaser at a mortgage foreclosure sale would not be entitled to possession and profits from the real estate until after the redemption period had expired, it is extremely unlikely that a third party would purchase the property at the foreclosure sale. Moreover, Minnesota law prohibits the inclusion in a mortgage instrument of any provision under which rents and profits arising from the mortgaged property after default are assigned to the mortgagee. Erickson-Hellekson-Vye Co. v. A. Wells Co., 217 Minn. 361, 15 N.W.2d 162 (1944).[8] Thus, assuming that Norwest and the Federal Land Bank follow reasonable and established marketing techniques, they will purchase the realty themselves at the foreclosure sale, and then attempt to resell the property after the redemption period has expired, if the Ahlers have not exercised their redemption rights. Since their right to foreclosure and to reinvest the liquidation proceeds would give them no financial benefit until the land could be resold to a third party, which at the earliest would be one year and six weeks from the date the foreclosure proceedings were commenced, the Ahlers’ adequate protection payments to protect this right to reinvestment returns on foreclosure proceeds should not begin until that date. See, e.g., Bear Creek Min-istorage, 49 B.R. at 457-58. If no foreclosure proceedings were commenced before the filing of the bankruptcy proceeding, the adequate protection payments would begin one year and six weeks after the adequate-protection motion was filed by the creditor.
Under Minnesota law, Norwest would be permitted to take possession of the farm machinery and equipment promptly unless the debtor is dependent on the use of the property to earn a living. In that event, the debtor is permitted to retain the property for a period of time if he insures it and makes payments essentially similar to what he would be required to make under the Bankruptcy Act. Minn. Stat.Ann. § 565.251 (West Supp.1986). It follows that adequate protection payments for farm machinery equipment should begin promptly on application therefor. Secured collateral such as livestock and grain in storage may be readily liquidated without any significant delay, and, hence, adequate protection payments on these items should also begin on application.
2. The date of valuation of collateral for adequate-protection purposes.
Congress specifically left open the question of the date of valuation. See p.-, infra. The bankruptcy court determined that values for purposes of adequate protection were to be fixed as of the date the petition was filed. While this decision is appropriate with respect to the livestock and grain in storage, which, under state law, could have been sold immediately, it is inappropriate with respect to the collateral that could not have been sold immediately. That collateral should be valued at the time it could have been sold under state law as discussed in section II.A.l of this opinion. Even if this timing *397 error were ignored, the bankruptcy court’s findings as to the values of the land and equipment were clearly erroneous. In making his decision, it failed to take into account the fact that land values had declined by at least twenty-four percent in the twelve-month period immediately preceding the filing of the petition in bankruptcy.[9] There is likewise no support in the record for the bankruptcy court’s statement that the debtor based his opinion as to value on conjecture.[10] The bankruptcy court will redetermine these values on remand.
3. Timing of periodic-protection payments.
The bankruptcy court ruled that the Ahlers must make adequate-protection payments monthly to maintain the automatic stay. This ruling ignores the cyclical nature of agriculture. A grain farmer’s income is not dependent upon a monthly paycheck, but rather upon the harvest of his crops at the end of the growing season. Likewise, a hog farmer’s income is realized when the hogs are sold. Thus, adequate protection payments in the Ahlers’ case should not be due until they have harvested their crops and sold their hogs.[11]
4. The use of growing crops as adequate protection.
We next address the bankruptcy court’s ruling that the Ahlers’ offer of a lien on the following year’s crop could not constitute adequate protection. This issue was thoroughly addressed in In re Martin, 761 F.2d 472 (8th Cir.1985), in which we held that a lien on a future crop, to the extent that the crop was otherwise not encumbered, may serve in whole or in part as a basis for providing adequate protection. We also outlined a nonexclusive list of factors the bankruptcy court should consider in making this determination. Id. at 477. Thus, the bankruptcy court’s ruling was contrary to the law of this circuit.
B. The district court erred in holding that reorganization under Chapter 11 is unfeasible.
Norwest and the Federal Land Bank contend that even assuming their interests were adequately protected during the automatic stay, they were entitled to relief from the stay under 11 U.S.C. § 362(d)(2)(B) because the Ahlers’ reorganization plan was not feasible. Section 362(d) provides:
(d) On request of a party and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
(2) with respect to a stay of an act against property under subsection (a) of this section, if—
(A) the debtor does not have an equity in such property; and
(B) such property is not necessary to an effective reorganization.
11 U.S.C. § 362(d).
Several courts have interpreted the “necessary for an effective reorganization” *398 language in section 362(d)(2)(B) to require a debtor to not only show that the property in question is essential to the reorganization plan, but also that an effective reorganization is realistically possible. See, e.g., In re Albany Partners, Ltd,., 749 F.2d 670, 673 n. 7 (11th Cir.1984); In re Discount Wallpaper Center, Inc., 19 B.R. 221, 222 (Bankr.M.D.Fla.1982); In re Dublin Properties, 12 B.R. 77, 80 (Bankr.E.D.Pa.1981), and cases cited therein. As the court stated in Dublin Properties, “If no reorganization of the debtor is feasible, then no property of that debtor can be necessary for that end.” 12 B.R. at 80. We have no quarrel with these decisions.
The district court, pursuant to this Court’s August 8,1985, order, reviewed the feasibility of the Ahlers’ reorganization plan. It analyzed the plan on the basis of the factors outlined in United Properties, Inc. v. Emporium Department Stores, Inc., 379 F.2d 55, 66-71 (8th Cir.1967),[12] and found that the plan was utterly unfeasible because (1) the debtor’s current liabilities exceeded his current assets by a substantial margin, and (2) the debtor could not, in the light of his past experience and current or anticipated farm programs, be expected to operate profitably with a significant cash flow.
Although the district court’s feasibility determination is subject to the clearly erroneous standard of review, id. at 63-64, “an appellate court has the power to correct errors of law, including ‘a finding of fact that is predicated on a misunderstanding of the governing rule of law.’” Martin, 761 F.2d at 475 (quoting Bose Corp. v. Consumer Union of United States, Inc., 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984).
The district court’s feasibility finding was predicated on a misunderstanding of the applicable law in that the district court failed to determine the value of the collateral, and therefore the amount of the secured creditors’ allowed secured claims, independent of the bankruptcy court’s adequate protection valuation. For purposes of the reorganization plan, the value of the collateral is to be determined at the time for confirmation of that plan. An initial valuation for adequate protection purposes is not res judicata for purposes of determining the value of the collateral, and thus the allowed secured claims of the creditors, under a reorganization plan. See 11 U.S.C. § 506(a).
While courts will have to determine value on a case-by-case basis [11 U.S.C. § 506(a) ] makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property. This determination shall be made in conjunction with any hearing on such disposition or use of property or on a plan affecting the creditor’s interest. To illustrate, a valuation early in the case in a proceeding under sections 361-363 would not be binding upon the debtor or creditor at the time of confirmation of the plan. Throughout the bill, references to secured claims are only to the claim determined to be secured under this subsection, and not to the full amount of the creditor’s claim.
S.Rep. No. 989 at 68, U.S.Code Cong. & Ad.News at 5854.
This revaluation is particularly important when, as in this case, the evidence demonstrates that the collateral decreased in value after the adequate protection valuation. Accordingly, because the district court failed to revalue the collateral in determining the feasibility of the Ahlers’ reorganization plan, its feasibility finding was based on a misunderstanding of the applicable law. Under these circumstances, it is appropriate to remand the case so that findings may be made applying the correct legal standards, and we need not address the issue of whether the district court’s feasibility finding was clearly erroneous. Martin, 761 F.2d at 475.[13]
*399 We note, however, that our review of the record leads us to believe that the Ahlers may be able to propose a feasible reorganization plan. While the Ahlers’ current liabilities do exceed their current assets, it appears probable that once their secured debt is restructured to reflect present values of land and equipment as Section 506(a) requires, they can repay that debt over a reasonable period of time with interest and make substantial payments to unsecured creditors. (The banks will hold more than ninety-five percent of the unsecured debt.) The basis for this conclusion is set forth in Appendix A to this opinion.
In brief, the Ahlers, on the basis of the record before us and current farm prices and programs, can reasonably expect an annual income of $126,500 per year from their farming operations. This sum would be disbursed essentially as follows:
to FLB as payments on secured debt on land of $306,000 (30 years at 12.5%)........................... $ 38,500
to Norwest as payments on secured debt on land of $89,000 (30 years at 12.5%)........................... $ 11,500
to Norwest, John Deere, and Commodity Credit Corporation as payments on secured debt on personal property of $94,000 (6 years at 10%).................... $ 21,500
to GMAC on secured debt of $3,000 (3 years at 10%).................... $ 1,200
Ahlers’ living expenses............. $ 11,500
tax and priority claims.............. $ 4,500
unsecured claims (This sum would be increased to $29,500 per year after 6 years.)......................... $ 37,800
$126,500
Our conclusion is, of course, based on the record before this Court at this time, and is not intended to bind the bankruptcy court on remand. On remand, the debtors will be permitted to amend their proposed plan, within thirty days of the receipt of this opinion, to reflect the law as stated in this opinion. If an amended plan is presented, the bankruptcy court will hold hearings on the plan and confirm or reject it on the basis of current data as to land and equipment values, interest rates, and farm prices and programs.
C. The absolute priority rule does not prevent this reorganization.
Norwest and the Federal Land Bank contend that they are entitled to relief from the automatic stay because any feasible reorganization plan submitted by the Ah-lers could not be confirmed. They argue that because their claims are substantially undersecured, any reorganization plan would treat a portion of their claims as unsecured. 11 U.S.C. § 506(a). As a class of unsecured creditors, they insist that they would not accept a reorganization plan, because the Ahlers could not pay the unsecured claims in full. Thus, they contend that the plan could not be confirmed under 11 U.S.C. § 1129(a)(8)(A).
Furthermore, Norwest and the Federal Land Bank argue that the Ahlers would not be successful in having the plan confirmed over their objections under 11 U.S.C. § 1129(b). They insist that because the Ahlers could not pay their unsecured claims in full, and because the Ahlers would retain an interest in the farm under a reorganization plan, the plan would not satisfy the “fair and equitable” requirement of section 1129(b)(1). Because Nor-west and the Federal Land Bank have, to this point, expressed their unwillingness to accept any plan under section 1129(a), we will examine whether a plan may be confirmed over their objections under section 1129(b).
Section 1129(b)(1) provides that a bankruptcy court shall, at the request of the debtor or other proponent, confirm a Chapter 11 plan over the objection of a class of creditors if the plan does not discriminate unfairly and is fair and equitable with respect to each class of creditors that has not accepted the plan. 11 U.S.C. § 1129(a)(1). Section 1129(b)(2) establishes the standards for determining whether a plan is “fair and equitable.” It adopts three different tests to determine whether a plan is fair and equitable, depending on whether the dis *400 senting class is comprised of secured claims, unsecured claims, or ownership interests. See generally 11 U.S.C. § 1129(b)(2)(AHC).
1. Secured claims.
With respect to a class of secured claims, a plan may provide
(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder’s interest in the estate’s interest in such property;
(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
(iii) for the realization by such holders of the indubitable equivalent of such claims.
11 U.S.C. § 1129(b)(2)(A).
Under subparagraph (i) the plan may be confirmed if the secured creditors retain a lien securing the amount of their allowed secured claims[14] and they receive deferred cash payments having a present value, as of the effective date of the plan, equal to the present value of the collateral.[15] Alternatively, the plan may be confirmed under subparagraph (ii) if the plan proposes to sell the collateral free and clear of the secured parties’ liens, as long as the lien will attach to the sale proceeds and will receive treatment under subparagraph (i) or (iii). Finally, subparagraph (iii) permits confirmation if the plan provides for the realization by the dissenting class of secured creditors of the indubitable equivalent of their claims. The legislative history to this subparagraph states that abandonment of the collateral to the secured creditor would clearly satisfy indubitable equivalence, as would a lien in similar collateral. 124 Cong.Rec. H32,407 (daily ed. Sept. 28, 1978) (statement by Rep. Don Edwards).
Assuming that the Ahlers’ reorganization plan proposes that they remain on the farm and continue to use the secured collateral in their farming operation, the plan must, to be confirmed over the dissent of the secured creditors, propose that the secured creditors retain a lien in the collateral securing the amount of their allowed secured claims, and that they receive deferred cash payments having a present value equal to the value of the collateral securing their claims as of the effective date of the plan. 11 U.S.C. § 1129(b)(2)(A)(i). If the plan also proposes to pay the secured creditors a reasonable rate of interest on their allowed secured claims, the present value and face future value will be identical. See H.R.Rep. No. 595 at 414-15, 1978 U.S.Code Cong. & Ad.News at 6370-71.
2. Unsecured claims.
With respect to a class of dissenting unsecured creditors, a plan will be “fair and equitable” if one of two tests is satisfied. First, the plan may provide that each unsecured creditor in the class receive or retain property having a value, as of the effective date of the plan, equal to the allowed amount of its claim. 11 U.S.C. *401 § 1129(b)(2)(B)(i). Norwest and the Federal Land Bank contend, and we agree, that any realistic reorganization plan proposed by the Ahlers could not provide the unsecured creditors with property equal to the amount of their allowed claims. Thus, any feasible plan would not meet the “fair and equitable” standard of section 1129(b)(2)(B)(i).
Alternatively, the plan may provide any treatment for the class of unsecured creditors, including no participation at all,[16] as long as no junior claims or interests participate in the plan or retain an interest in the debtor’s property. 11 U.S.C. § 1129(b)(2)(B)(ii). Norwest and the Federal Land Bank contend that because the Ahlers could not provide the unsecured creditors- with property equal to the allowed amount of their claims, any non-liquidation plan would not satisfy the “fair and equitable” standard of section 1129(b)(2)(B)(ii). They argue that under any reorganization plan, the Ahlers would retain an equitable ownership interest, which is junior to the unsecured creditors’ claims, without providing for the unsecured creditors in full. We do not agree that retention of this equitable ownership interest is fatal to the Ahlers’ plan being “fair and equitable” under section 1129(b)(2)(B)(ii).
Section 1129(b)(2)(B) essentially applies a modified version of the traditional absolute priority rule, which was initially established in Northern Pacific Railway v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913). See 3 Norton, Bankruptcy Law & Practice § 63.21 (1985). Simply stated, the absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under the plan. However, in cases decided after Boyd, the Supreme Court specifically recognized that there may be circumstances in which the absolute priority rule could be modified to allow a junior ownership interest to participate in the reorganization plan even though dissenting senior creditors may receive less than their allowed claims.
In Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), the Court stated:
It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, indicated as much in Northern Pacific Railway Co. v. Boyd, supra [228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931] and Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra [271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028]. Especially in the latter case did this Court stress the necessity, at times, of seeking new money “essential to the success of the undertaking” from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.
Id. at 121, 60 S.Ct. at 10 (footnote omitted). The Court continued by stating that if these conditions were satisfied,
the creditor cannot complain that he is not accorded “his full right of priority against the corporate assets.”
In view of these considerations we believe that to accord “the creditor his full right of priority against the corporate assets” where the debtor is insolvent, the stockholder’s participation must be based on a contribution in money or in money’s worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder.
*402 Id. at 122, 60 S.Ct. at 10 (footnotes omitted) (emphasis added).
In the Kansas City Terminal Railway case cited by the Court in Case, the Supreme Court stated:
Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights.
Kansas City Terminal Railway, 271 U.S. at 455, 46 S.Ct. at 551-52.
See also Sophian v. Congress Realty Co., 98 F.2d 499, 502 (8th Cir.1938) (“to justify retention of stock interests by stockholders of debtor it must appear that they have furnished some compensatory additional consideration or have an equity interest in the estate of the debtor after the rights of creditors are fully provided for”); In re U.S. Truck Co., 47 B.R. 932, 940-41 (E.D.Mich.1985): In re Marston Enterprises, Inc., 13 B.R. 514, 517-18 (Bankr.E.D.N.Y.1981) (contribution of new capital necessary to fund reorganization plan in return for participation in reorganization plan did not violate “fair and equitable” rule, even though intervening classes of creditors received nothing under the plan).
Thus, a more accurate summation of the absolute priority rule would be that a dissenting class of unsecured creditors must be provided for in full before any junior class may receive or retain any property under the plan, unless the junior class contributes to the reorganization enterprise something that is reasonably compensatory and is measurable.
Certainly, a farmer’s efforts in operating and managing his farm is essential to any successful farm reorganization, and this yearly contribution is measurable in money or money’s worth. Moreover, the reorganization value of the Ahlers’ farm exceeds its liquidation value — if the plan is rejected, the unsecured creditors will get nothing, whereas they will receive annual payments if the plan is approved and is successful. The Ahlers’ farm operation and management skills are something of a value which would disappear if their farm was liquidated. Because that value cannot be captured for creditors in the event of liquidation, fairness is not violated if their Chapter 11 plan leaves that value in their hands. This view also recognizes the broad rehabilitative purposes of the Bankruptcy Act — to give a debtor with a reasonable chance of success an opportunity for a fresh start. Any other view would deny to most farmers the opportunity to take advantage of the reorganization provisions of .the Bankruptcy Act. Accordingly, the farmer should be entitled to participate in the plan to the extent of this contribution, even though more senior claims are not provided for in full under the plan. The only remaining question, therefore, is whether the farmer’s new contribution is reasonably equivalent to the equitable ownership interest the farmer would retain under the plan.
We recognize that there is no mathematical formula which the bankruptcy court can apply to make this determination, and that this determination must necessarily depend on the facts in each case. However, the value of the farmer’s labor, including the value of his experience and expertise in farming the land, should not be overly difficult to determine. Valuing the retained equitable ownership interest, however, is a more difficult problem.
In In re U.S. Truck the court stated that in determining the general worth of the retained interest, a court must necessarily make determinations regarding the future of the debtor as reorganized, and its possible profits. 47 B.R. at 941-42 (citing In re Landau Boat Co., 13 B.R. 788 (Bankr.W.D.Mo.1981)). In Landau Boat the creditors argued that the shareholders were retaining equity value without consideration because the debtor corporation, as an ongoing business, was worth more than the shareholders’ new contribution. The court in Landau Boat stated:
The commercial value of property consists in the expectation of income from it * * *. Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with reorganization plans involving pro *403 ductive properties * * *. The criterion of earning capacity is the essential one * * * if the allocation of securities among the various claimants is to be fair and equitable * * *. Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earnings capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance.
13 B.R. at 792-93 (quoting Consolidated Rock Products v. DuBois, 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941)). The court found that the debtors’ corporation had the potential to be profitable. Landau Boat, 13 B.R. at 793. However, after considering the debtor’s financial needs, including debt service, the state of the economy, and the fact that the debtor was in a highly competitive business, the court concluded that the probability of the debtor making a real profit in the next few years was unlikely. Id. Thus, the court found that the new investors were making a substantial investment which exceeded any value that could be realized from thé business in the near future. Id.
Applying these principles to the present case, the Ahlers would not realize any real profit or benefit from their retained equitable ownership interest until the reorganization plan was completed and the secured creditors had been paid the full amount of their allowed secured claims. At this time, the equitable ownership interest would mature. Thus, if the bankruptcy court determines that the value of the Ah-lers’ yearly contributions of labor, experience, and expertise over the life of the plan will equal or exceed the value of the retained ownership interest at maturity, the dissenting unsecured creditors cannot complain that they have not been accorded their full right of priority against the debtors’ assets.[17]
We recognize, of course, that because the profitability of any reorganization plan cannot be determined with mathematical certitude, the possibility exists that the plan may be more profitable than anticipated. If so, and if the equitable ownership interest receives this excess profit, the equitable ownership interest may receive more than the value of its contribution. To avoid this result, the bankruptcy court should require that any cash flow from the operation of the farm in excess of that anticipated in the plan should be paid to the unsecured creditors on a pro rata basis until such time as the unsecured creditors are paid in full without interest. Similarly, if any secured property is sold during the life of the plan, and if the unsecured creditors have not been paid in full, excluding interest, before that date, the bankruptcy court should require that any amount received in excess of that necessary to pay the secured creditors be shared equitably among the unsecured creditors and the ownership interest, based on its contribution at the time the property is sold.[18]
This matter is remanded to the district court with directions that the bankruptcy court take prompt action to comply with this opinion.[19] Each party to this appeal is to bear its own costs.

. According to the highly respected publication of the University of Minnesota, Dion and Raup, The Minnesota Rural Real Estate Market in 1985, Minnesota Agricultural Economist, No. 650, Jan. 1986, average land values in southwest Minnesota increased from $844 per acre in 1975 to $2,083 per acre in 1981. They fell to $1,401 per acre in 1984, and to $967 per acre in 1985. This study supports the testimony of the Federal Land Bank’s expert witness, Dennis Christensen, that land values in southwest Minnesota continued to fall in 1984. With respect to the propriety of using these studies for the limited purpose intended in this opinion, see Davis, Judicial Notice, 55 Col.L.Rev. 945, 951 (1955); Wright & Graham, Federal Practice & Procedure: Evidence § 5102, p. 462; Currie, Appellate Courts Use of Facts Outside of the Record by Resort to Judicial Notice and Independent Investigation, 1960 Wisc.L.Rev. 39. See also Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); AFL v. American Sash & Door Co., 335 U.S. 538, 551, 69 S.Ct. 260, 264, 93 L.Ed. 222 (1949); Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed. 813 (1924).

. The bankruptcy court also concluded that a $12,200 retainer paid by the Ahlers’ son to their attorney was excessive and deprived the Ahlers of funds needed to pay for living expenses during the pendency of the case. It ordered the Ahlers’ attorney to return the retainer fee to the son and, in a subsequent order, awarded the attorney $5,000 for fees and expenses incurred, without prejudice to the attorney’s application for additional expenses incurred at a later date. We find no abuse of discretion and affirm. See S.Rep. No. 989, 95th Cong., 1st Sess. 39-40, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5825-26; In re McCombs, 751 F.2d 286, 288 (8th Cir.1984); In re Mullendore, 527 F.2d 1031, 1038 (10th Cir.1975).

. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 340, reprinted in 1978 U.S.Code Cong. & Ad. News 5963, 6296-97.
The automatic stay is one of the fundamental debtor protections provided by the bankrupt- *394 ey laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

Id.

. See H.R.Rep. No. 595 at 340, 1978 U.S.Code Cong. & Ad.News at 6297.
The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor’s assets prevents that.

Id.

. "Allowed secured claim’’ is defined at 11 U.S.C. Section 506(a). If the creditor has a lien against property, and if he is oversecured, the allowed secured claim is the amount of the debt. If he is undersecured, it is the value of the collateral. Hence, the statute contemplates the division of claims into secured and unsecured parts, with reference to the worth of the property. As explained in the House Report: "One of the more significant changes from current law in proposed Title 11 is the treatment of secured creditors and secured claims. Unlike current law, H.R. 8200 distinguishes between secured and unsecured claims, rather than between secured and unsecured creditors. The distinction becomes important in the handling of creditors with a lien on property that is worth less than the amount of their claim, that is, those creditors that are undersecured. Current law is ambiguous and vague, especially under Chapter XIII, on whether an undersecured creditor is to be treated as a secured creditor, or as a partially secured and partially unsecured creditor. By addressing the problem in terms of claims, the bill makes clear that an un-dersecured creditor is to be treated as having a secured claim to the extent of the value of the collateral and an unsecured claim for the balance of his claim against the debtor. * * H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 180-81 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 6141.
In Re South Village, Inc., 25 B.R. 987 (Bankr.D.Utah 1982) (quoting In re Alyucan Interstate Corp., 12 B.R. 803, 806-09 (Bankr.D.Utah 1981).

. See Grundy National Bank v. Tandem Mining Corp., 754 F.2d 1436, 1441 (4th Cir.1985). If the secured creditor has not initiated any action to gain possession and liquidate the collateral pri- or to the filing of the bankruptcy petition, it has not been deprived of this benefit of its bargain when the petition is filed. Thus, the starting date should not be when the petition is filed, but rather when the secured creditor seeks either possession of the collateral or adequate protec *396 tion. Moreover, this ruling will prevent a hardship to the debtor caused by an adequate protection motion filed well after the bankruptcy petition has been filed, which could require sizeable “makeup” payments. It is not unreasonable to require the creditor to be vigilant in requesting protection if it wants this protection.

. The twelve-month redemption period applies to tracts of land exceeding ten acres in size. Minn.Stat.Ann. § 580.23, subd. 2(c). For tracts of land less than ten acres in size, the redemption period is six months. Id. § 580.23, subd. 1.

. See also Orr v. Bennett, 135 Minn. 443, 446, 161 N.W. 165 (1917), where the court stated:
[T]he mortgagor has the right of possession and the right to the rents and profits of the land incident to possession during the statutory year allowed for redemption and until the foreclosure is complete; and any stipulation in the mortgage, or contemporaneous with it, pledging the rents and profits of the mortgaged land to the payment of the mortgage debt contravenes the policy of that statute and is void.

. Dennis Christensen was called as an expert for the Federal Land Bank. He testified in February of 1985 that farmland values in Nobles County declined by twenty-four percent in 1984. He further stated: “This investigation along with recent trips to southern and southwestern Minnesota lead me to believe the real estate market for farm properties is very soft and getting softer.” Arden Harberts was called as an expert witness for Norwest. He testified that land values in the County fell by thirty percent from June, 1983, to June, 1984, and by an additional fifteen percent from the latter date to February, 1985. Christensen failed to provide detailed information as to when the comparable sales used by him took place except that they occurred during 1984. Harberts reported that he used four sales as comparables. Two occurred in September and two in November.

. In response to a direct question from the court as to the basis of his opinion as to his land values, Ahlers stated: "Mostly hearsay. There is land around here that will bring in six and seven hundred dollars, too, and five hundred dollars and the like. I have heard in the last four or five or six months of prices being as high as a thousand dollars, but that was for land better than mine.” Under Minnesota law, an owner is qualified to testify as to the value of his own land. Vreeman v. Davis, 348 N.W.2d 756 (Minn.1984); LaValle v. Aqualand Pool Co., Inc., 257 N.W.2d 324 (Minn.1977).

. Of course this does not mean that adequate protection payments may not be accumulated prior to the harvest. For example, if the payments were to begin in May, and the crop was harvested in August, the farmer would be required to pay the four months’ accumulated adequate protection payments in August. As discussed in the following section, a lien on this growing crop may provide the creditor with adequate protection during this period.

. Following are the factors that were outlined in United Properties, Inc. v. Emporium Department Stores, Inc., 379 F.2d 55, 66-71 (8th Cir.1967): (1) the ratio of current assets to current liabilities; (2) the debtor’s solvency; (3) evidence that the debtor could operate at a profit; (4) the debtor’s cash flow; (5) the capability of the debtor’s management; and (6) economic conditions affecting the debtor’s situation. Based on this analysis, the district court found that the proposed plan was utterly unfeasible, even without regard to the monthly adequate protection payments required by the bankruptcy court.

. The dissent argues that this Court’s opinion places the loss resulting from a drop in farmland values during the pendency of the automatic stay entirely on the banks, and that this result is neither reasonable nor fair. However, the *399 banks will be protected from falling values from the date that they could obtain possession of the property until the plan is confirmed, see section IIA(l) of this opinion, and this period should ordinarily be more than sufficient to obtain confirmation or rejection of a plan. As for the loss that occurs during the redemption period, banks unfortunately will have to absorb this loss with or without a bankruptcy proceeding. Indeed, if a feasible plan is submitted and approved, the banks may realize more under reorganization than they could under liquidation. This opinion simply recognizes reality.

. The allowed secured claim will equal the value of the collateral at the time the plan is confirmed. See 11 U.S.C. § 506(a); S.Rep. No. 989 at 68, 1978 U.S.Code Cong. & Ad.News at 5854.

. See H.R.Rep. No. 595 at 414-15, 1978 U.S. Code Cong. & Ad.News at 6370-71.
Application of the test under [11 U.S.C. § 1129(b)(2)(A)] also requires a valuation of the consideration "as of the effective date of the plan." This contemplates a present value analysis that will discount value to be received in the future; of course, if the interest rate paid is equivalent to the discount rate used, the present value and face future value will be identical.
******
Normally, the interest rate used in the plan will be prima facie evidence of the discount rate because the interest rate will reflect an arms length determination of the risk of the security involved and feasibility considerations will tend to understate interest payments.

Id.

. See 124 Cong.Rec. H32.408 (daily ed. Sept. 28, 1978) (statement by Rep. Don Edwards):
Alternatively, under [11 U.S.C. § 1129(b)(2)(B)(ii) ], the court must confirm the plan if the plan provides that holders of any claims or interests junior to the interests of the dissenting class of impaired unsecured claims will not receive any property under the plan on account of such junior claims or interests. As long as senior creditors have not been paid more than in full, and classes of equal claims are being treated so that the dissenting class of impaired unsecured claims is not being discriminated against unfairly, the plan may be confirmed if the impaired class of unsecured claims receives less than 100 cents on the dollar (or nothing at all) as long as no class junior to the dissenting class receives anything at all.

Id.

. For example, assume that the bankruptcy court values the debtor’s labor, experience, and expertise at $40,000 per year, and that the plan provides for yearly living expenses of $12,000. The debtor will have contributed $28,000 per year for his retained equitable ownership interest.

. For example, if the equitable ownership interest has contributed $100,000 at the time the property is sold, and the property constitutes ten percent of the total bankruptcy estate, the ownership interest should be entitled to $10,000 of the excess after the secured creditor has been paid in full. Any amount in excess of this $10,000 should be distributed equitably among the unsecured creditors.

. While this opinion was being circulated, counsel for Norwest advised the Clerk’s Office that an agreement, in substance, to settle the dispute between Norwest and the Ahlers has been reached. The settlement has not yet been reduced to writing and filed with this Court, however. Norwest does not argue that the case is now moot, and points out that no settlement has been reached between the Ahlers and the Federal Land Bank or the Trustee in Bankrupt *404 cy. Accordingly, there remain issues in controversy for this Court to resolve. Nothing the Court has said in this opinion should obviate whatever agreement may have been reached between Norwest and the Ahlers.